**Rose McCOY, Plaintiff,**

v.

**Gary M. GOLDBERG and Gary Goldberg & Company, Inc., Defendants.**

**Gary M. GOLDBERG and Gary Goldberg & Company, Inc., Third–Party Plaintiffs,**

v.

**Stephen RUFFINO, et al., Third–Party Defendants.**

**No. 89 Civ. 8151 (WCC).**

United States District Court, S.D. New York.

Jan. 4, 1993.

Deutsch and Frey, New York City (Herbert I. Deutsch, of counsel), for plaintiff.

Parker Chapin Flattau & Klimpl, New York City (Charles P. Greenman, Stephen G. Rinehart, of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Rose McCoy, a part-time nurse, instituted this action against defendants Gary Goldberg & Company, Inc., a securities brokerage and financial planning concern, and Gary M. Goldberg, its President (collectively "Goldberg"), asserting claims based on violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the federal securities laws, common law fraud, and breach of fiduciary duty in connection with plaintiff's purchases of various limited partnership interests. After a trial in which the jury found for plaintiff on the breach of fiduciary duty claim and awarded compensatory damages in the amount of $872,714, defendant moved this Court for a new trial or a remittitur of the damages award. For the following reasons, defendants' motion for remittitur is granted.

## BACKGROUND

McCoy initially contacted Goldberg in 1983, when, recently widowed, she received proceeds from an insurance policy on her late husband's life. Tr. 11–12, 136, 141–143. She contacted defendants seeking financial advice, planning, and services in relation to investing the insurance proceeds, with a view towards preserving the principal and generating approximately $50,000 per year in income. Tr. 142–153, 311. McCoy testified that Goldberg understood plaintiff sought a safe investment program that would preserve her principal as well as meet her income needs. Tr. 144, 147, 149, 151.

The jury found that, based on Goldberg's representations, plaintiff invested a total of $596,000 in twelve limited partnership interests between 1983 and 1986. Pl. Orig.Mem. Ex. A; Pl.Suppl.Mem. Ex. A;

Def.Orig.Mem. at 2. Plaintiff made her investments in three different periods: $268,500 in four interests in August, 1983; $315,000 in seven interests in August, 1984; $12,500 in one interest in October, 1986. The investments were as follows:

| Investment | Amount ($) | Period Held |
|---|---|---|
| NTS IV | 83,000 | 8/30/83 — present |
| Phoenix VI | 85,000 | 8/30/83 — present |
| Public Storage | 40,500 | 8/30/83 — present |
| NC/KC | 60,000 | 8/30/83 — present |
| NTS V | 75,000 | 8/30/84 — 1/21/92 |
| IEA | 10,000 | 8/30/84 — present |
| Angeles | 50,000 | 8/30/84 — 7/31/89 |
| AIM | 25,000 | 8/30/84 — 6/23/89 |
| Damson | 75,000 | 8/30/84 — 8/23/89 |
| Carlyle | 30,000 | 8/30/84 — 10/11/89 |
| PLM | 50,000 | 8/30/84 — 6/16/89 |
| Wildwood | 12,500 | 10/31/86 — present |

Pl. Ex. 131; Pl.Suppl.Mem. Ex. A.

Following an eight-day trial, the Court charged the jury and submitted a five-page Special Verdict Form covering plaintiff's federal securities law, RICO, common law fraud, and breach of fiduciary duty claims against defendants. After deliberating for approximately one hour and twenty-five minutes, the jury returned with a verdict for defendant on the securities law, RICO, and common law fraud claims and for plaintiff on the breach of fiduciary duty claim, as well as with a damage award for plaintiff in the amount of $872,714. The Special Verdict Form revealed that the jury's award was comprised of the following components: $596,000, constituting the principal amount invested by plaintiff as a result of defendants' breach of fiduciary duty, and $817,391, representing the interest plaintiff would have earned on this principal sum by investment in risk-free securities during the time the principal was tied up in the investment vehicles recommended by defendants. From the sum of these two amounts, the jury subtracted a credit of $540,677, reflecting the total of distributions to Mrs. McCoy on her investments, proceeds from the sale of investments plaintiff liquidated, and the present value of plaintiff's remaining investments. This calculation—$596,000 plus $817,391, less $540,677—yielded the total award to plaintiff of $872,714.

The bulk of plaintiff's award was comprised of "the amount of interest which would have been earned on a risk-free investment of such principal during the time the principal was tied up in such investments." Verdict Form, Question 6(2). Defendants now move for remittitur on grounds that this portion of the damage award was unreasonably excessive in view of the Court's instruction and the evidence at trial concerning rates of interest available on "risk-free" investments.

## DISCUSSION

I. *Defendants' Motion For Remittitur*

Remittitur, "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320 (2d Cir.1990) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." *King v. Macri*, 800 F.Supp. 1157, 1160–61 (S.D.N.Y.1992) (quoting *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990)). A court may properly grant remittitur where the jury's award is "so high as to shock the judicial conscience and constitute a denial of justice." *See Macri*, 800 F.Supp. 1157, 1161 (citing *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978); *Is-*

*mail*, 899 F.2d at 186; *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir.1988); *O'Neill v. Krzeminski*, 839 F.2d 9, 13–14 (2d Cir.1988)); *In re Joint Eastern & Southern Dist. Asbestos Lit.*, 798 F.Supp. 925, 936–37 (E.D.N.Y.1992). When a jury's award is so "grossly excessive," a court may order the plaintiff to remit excessive damages or undergo a new trial on the issue of damages. *Petramale v. Local No. 17 of Laborers' Intern.*, 847 F.2d 1009, 1012–13 (2d Cir.1988) (new trial ordered on issue of compensatory damages, unless plaintiff agrees to remit portion of compensatory damages).

■ In calculating a remittitur, a district court is bound to employ a standard that is "least intrusive" upon the jury's award. *Bouchard Transp. Co.*, 917 F.2d at 1328–30. Under such a standard, the court can remit the jury's award only to the "maximum amount that would be upheld by the district court as not excessive." *Id.* at 1330; *see also Shu–Tao Lin*, 742 F.2d at 49–50 (reduce to maximum amount that a reasonable jury could have awarded, citing *Reinertsen v. George W. Rogers Constr. Corp.*, 519 F.2d 531 (2d Cir.1975)).

■ Under the standard articulated above, the Court finds that the jury's award of $872,714 in compensatory damages on plaintiff's breach of fiduciary duty claim is sufficiently excessive to warrant remittitur. The Court's verdict form instructed the jury to include, as an element of damages, "the amount of interest that would have been earned on a risk-free investment of [plaintiff's] principal during the time the principal was tied up [in the

investments recommended by defendants]." The jury's response to this instruction was to find that a risk-free investment of the principal amount of $596,000, invested over time periods ranging from approximately five to nine years (reflecting the time plaintiff's principal was tied up in the various limited partnership interests), would generate interest income in the amount of $817,391. Based on evidence presented to the jury concerning the risk-free investment instruments available to plaintiff, we find the jury's interest calculation to be grossly excessive, even under the high interest rates that prevailed during the early 1980's.

According to the figures provided by plaintiff in Exhibit A of plaintiff's supplemental memorandum in opposition to defendants' motion [1]—figures reflecting the dollar amount of each investment made by plaintiff and the respective term, in years, that each investment was held—we calculate that to earn the interest income of $817,391 awarded by the jury, plaintiff would have to receive interest income from alternate, risk-free instruments held for the same respective time periods, at a rate of 18.89% per annum on a simple interest basis.[2] Such a rate, unsupported by any evidence in the record, is far in excess of the yields then available to plaintiff on alternate, risk-free investments.

Plaintiff's own expert, Louis Ehrenkrantz, utilized interest rates of 11.8% and 12.7% as the rates available on risk-free investment alternatives available to plaintiff during the time periods in question—namely 1983 and 1984, respectively—in the

---

**1.** Plaintiff's counsel note that the dates of holding and sale for each investment, from which counsel calculate the term, in years, that each investment was held, are taken from plaintiff's own Exhibit 131, received into evidence without objection. Pl. Suppl. Mem. at Exhibit A, n. 1 (*see* Appendix).

**2.** To arrive at this rate of interest, we merely took the interest amount the jury awarded plaintiff, and divided it by the product of the principal amount and term of all investments plaintiff held, based on the formula:

$$R = \frac{I}{(P_1 \times T_1) + (P_2 \times T_2) + \ldots + (P_{12} \times T_{12})}$$

where:

$I$ = the total interest income awarded (here $817,391);

$P_1, P_2, \ldots P_{12}$ = the respective principal amount of each of the twelve investments;

$T_1, T_2, \ldots T_{12}$ = the respective term, in years, each principal sum was tied up in the investment;

$R$ = the rate of interest plaintiff had to earn on each investment to generate the interest income awarded.

analysis he undertook of an optimal portfolio mix for plaintiff. Tr. at 726–39. These rates purportedly reflect the yields then available on United States Treasury securities: 11.8% on thirty-year treasury bonds in 1983; 12.7% on twenty-year treasury bonds in 1984.[3] Tr. at 726. During his testimony, Mr. Ehrenkrantz stated, more than once, that United States Treasury securities were the only risk-free, or more precisely, the safest investment vehicles available to plaintiff.[4] Tr. 732, 736, 738. Based on plaintiff's own analysis, an alternate, risk-free investment of the principal sums available to plaintiff in 1983 and 1984, invested at the applicable 11.8% and 12.7% treasury bond rates over the time periods that plaintiff's funds were tied up in defendants' proposed investments, would have earned plaintiff income in the amount of $524,354.85.[5] Pl.Suppl.Mem. at Ex. A. Indeed, in the event the Court grants defendants' motion for remittitur, it is this sum of $524,354.85 that plaintiff herself proposes that the Court adopt as the income damages to which plaintiff is entitled.[6] *See* Appendix (taken from Exhibit A to plaintiff's supplemental memorandum).

 It should be noted that the 11.8% and 12.7% rates of interest furnished by plaintiff's expert reflect yields available on thirty- and twenty-year treasury bonds, the longest maturity treasury bonds available.

Consequently, these interest rates are situated at the very high end of the rates then available to plaintiff on risk-free investments in United States Treasury securities. Were this Court to calculate, in the first instance, a reasonable figure for the interest income plaintiff would have earned on risk-free investments of her principal, we would predicate our calculation on interest rates between 8% and 10%, reflecting yields then available on five to ten-year treasury securities. Because plaintiff's funds were invested over time periods ranging from five to nine years, interest rates taken from treasury instruments of these maturities reflect more accurately the return available on plaintiff's principal "during the time the principal was tied up in such investments," and consequently are more congruous with the Court's instruction to the jury. However, we are keenly aware that in computing remittitur, a district court may not reduce the award to what it believes a "properly functioning jury, acting free of suggestions by counsel," should have reasonably awarded as a fair and practicable judgement. *See Bouchard Transp. Co.*, 917 F.2d at 1329–30. Rather, we may only reduce the award to the maximum amount that we could uphold as not excessive. *Id.* Consequently, under the prevailing standards of remittitur, we find that plaintiff's proposed interest income

3. The 11.8% and 12.7% figures reflect the average yield on the respective securities during the relevant month in each of the two years in question: rather than pick a random day, Mr. Ehrenkrantz took the average yield of the then-current thirty and twenty-year bonds over the entire month during which the plaintiff could have invested her funds. Tr. at 727.

4. Plaintiff's asserts that "the record supports the availability of higher interest rates—14.7% through investment in good quality corporate bonds" (Pl.Orig.Mem. at 16). As support for this proposition, plaintiff cites to a section of the transcript in which plaintiff's expert testified that:

"I think she would have done slightly better in good quality corporate bonds than in Treasuries but not enough to compensate her for the risk. I think she would have gotten an extra two percent on her money. I don't think that's worth giving up the United States government guarantee."

Such a declaration is hardly resounding testimonial support for the conclusion that higher rates of return on risk-free investments were available to plaintiff.

5. This income figure also includes interest income of $6,840 earned on a principal amount of $12,500 available to the plaintiff from the period October 31, 1986 to the present (in lieu of plaintiff's investment in the Wildwood partnership interest), at plaintiff's proposed rate of 9.0%. Plaintiff's suggestion that the 9.0% rate represents the yield then available on five-year treasury securities as reflected in the record (Tr. 818, 834) is not entirely accurate. However, because the amount of this particular investment is relatively minor and time period relatively short, we accept plaintiff's proposed rate.

6. Plaintiff additionally urges that the Court permit prejudgment interest on this interest income. As discussed below, we are disinclined to accept plaintiff's contention concerning prejudgment interest.

calculation of $524,354.85 constitutes the maximum interest amount a jury could award without excess. Thus we find that the portion of the jury's award constituting the amount of interest which would have been earned on a risk-free investment of principal during the time the principal was tied up in defendants' recommended limited partnership interests should be reduced from $817,391 to $524,354.85.

In maintaining that the jury's interest award was not excessive, plaintiff suggests the possibility that the jury may have calculated interest on the principal sums of each of the twelve investments, from the time of each investment to the present, rather than up to the time a particular investment was liquidated by plaintiff. Pl. Orig.Mem. at 19–21 (responding to defendants argument that an award of interest on the full principal over a period of nine years would be excessive). Plaintiff suggests that defendants are not in a position to object "to the propriety of the jury's calculation on that basis." Pl.Orig.Mem. at 20–21. We remain uncertain of the rationale plaintiff advances, in this regard, to bolster her position against the granting of remittitur. Assuming the jury did calculate interest on each principal sum over a period extending to the present time, we calculate—based on the formula outlined in footnote two above—that to earn the interest income of $817,391 awarded by the jury, plaintiff would have to receive interest income from alternate, risk-free investments at a rate of 15.85% per annum on a simple interest basis. This rate would still be considered excessive in view of the treasury bond rates utilized by plaintiff's own expert, and therefore remittitur would still be warranted. More decisively, the Court's verdict form, to which plaintiff did not object, specifically permitted interest to be

awarded based only on what would have been earned on a risk-free investment *"during the time the principal was tied up in such investments,"* (emphasis added). Plaintiff's Exhibit 131, received into evidence without objection, lists plainly the dates plaintiff liquidated a portion of her investments; from those dates onward, plaintiff's principal could no longer be considered "tied up" in such investments. Consequently, if the jury awarded plaintiff interest income calculated over a period extending beyond those dates, this would directly contravene the Court's explicit instruction. For plaintiff's counsel to intimate that this was either proper or somehow unobjectionable is hardly support for plaintiff's position against remittitur.

Plaintiff offers three additional grounds on which to justify the jury's interest income award: (1) addition of a 4% per year inflation factor to the 11.8% and 12.7% interest rates on the respective twenty and thirty-year treasury securities; (2) inclusion of a 9% reinvestment factor to the interest garnered from these alternate, risk-free treasury bond investments; (3) compounding of the interest income from these same treasury bonds. Pl.Orig.Mem. at 17–19; Pl.Suppl.Mem. at 3–4. Through a series of computations, plaintiff shows that the total interest award generated by each of these three mechanisms are at levels around or above the jury's $817,391 interest award. Pl.Orig.Mem. at 17–19, and Ex. A–D.[7]

■ Plaintiff's theories run counter to the Court's explicit instructions and, if accepted, would yield an excessive interest income award. The imposition of a 4% inflation factor is contrary to the plain language of the instruction in the jury verdict

---

7. Inasmuch as plaintiff marshals a rather impressive array of fairly technical calculations to justify the jury's quickly arrived at damage award, we find it necessary to point to a mechanical flaw in plaintiff's analysis that may undermine the results in each of the three carefully crafted scenarios plaintiff depicts. While it is not precisely clear from Exhibits A–D in plaintiff's original memorandum, it seems plaintiff has assumed an investment horizon of 8.25 and 9.25 years in each instance, essentially as-

suming that plaintiff's entire principal was "tied up" to the present time. The Court's instruction, however, should have led the jury to take into account the fact that plaintiff liquidated some of her investments, signaling an end to the period over which interest on an alternate, risk-free investment could be calculated. However, because we find other more consequential reasons to decline to accept plaintiff's proffered justifications, we choose not to analyze at length the mechanics of plaintiff's computations.

form, which directed the jury to calculate only the amount of income that could have been generated at risk-free rates of interest. The jury was never instructed to adjust for inflation, nor, for that matter for reinvestment or compounding. Moreover, as defendants note, adding an inflation factor actually creates a windfall for the plaintiff beyond the already high rates of interest she is granted on this alternate, risk-free investment; the inflation factor serves to grant plaintiff a return she would not have obtained had she actually received proceeds from such an alternate investment. Finally, the very interest rates under which plaintiff's income award is calculated include a component to account for inflation; to include an additional inflation factor would therefore be duplicative. *See In re Complaint of Connecticut Nat. Bank*, 928 F.2d 39, 44–46 (2d Cir.1991) (market interest rate indicates true cost of money plus a factor that reflects financial community's prediction of annual inflation rate).

■ Plaintiff's reinvestment and compounding theories suffer from similar defects. The transcript is replete with references to plaintiff's need for income from her investments, in amounts of initially $35,000, raised to $50,000 per year, to meet plaintiff's living expenses. Tr. 13, 16, 144, 147, 149, 151, 311–13. Consequently, it is unlikely that the income plaintiff could have earned on alternative, risk-free investments would have been available to reinvest and compound. Plaintiff's counsel maintain that the record "amply supports the fact that substantial amounts of interest income were available for reinvestment" (Pl.Orig.Mem. at 18 n. 9), yet the sections of the transcript to which counsel cite do not provide any firm indication of the amount of income available to plaintiff to meet her living expenses, much less suggest that the amounts available for reinvestment were substantial. Based on the evidence in the record, we find the conclusion that a substantial portion of the interest income would be available to reinvest to be, at best, highly conjectural. Under these circumstances, we agree with defendants that any award of damages based on reinvestment or compounding of interest would be speculative and in the nature of lost profits which may not be recovered. Plaintiff cites *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 51 (2d Cir. 1984), for support of her reinvestment theory. Pl.Orig.Mem. in Supp. at 18. The case is inapposite. The portion of the opinion cited by plaintiff does not concern reinvestment of interest income; rather it concerns the Circuit Court taking judicial notice of the fact that a plaintiff's damage award, if entirely invested in tax-free securities, would yield tax-free income so that the trier of fact may not automatically conclude that taxes will be paid on income produced by such an award. *See* 742 F.2d at 45.

In sum, plaintiff's infusion of an inflation, reinvestment or compounding factor into the interest income component of damages to justify the jury's excessive award is conjectural, speculative and contrary to the Court's explicit instruction. As defendants correctly note, the Court already augmented the strict "out of pocket" measure of damages by ordering the jury, in computing damages, to add to plaintiff's loss of principal, a reasonable amount of imputed risk-free interest income. To award more would clearly constitute a windfall, far in excess of the goal of making plaintiff whole. Consequently we order remittitur of that portion of plaintiff's interest income award of $817,391 in excess of the sum of $524,354.85, yielding plaintiff a net compensatory damage award of $579,677.85. If plaintiff does not accept such remittitur, the Court will order a new trial on the issue of damages.

## II. *Plaintiff's Request For Prejudgment Interest*

■ Plaintiff maintains that in the event the Court should grant remittitur, under New York law plaintiff is entitled to receive prejudgment interest on the both the lost principal and interest portions of her damage award. Pl.Suppl.Mem. at 4. Plaintiff cites to N.Y. CPLR § 5001, and to various federal and state cases in support of her theory. Pl.Suppl.Mem. at 4–8 and

Ex. B–D. Neither N.Y. CPLR § 5001, nor the numerous cases cited by plaintiff provide support for an award of prejudgment interest in this instance, where the total damages awarded to plaintiff already include a sizable interest component intended to compensate plaintiff for the loss of the use of her principal.

In suits alleging both federal securities and pendent state law claims, the "award of prejudgment interest on the federal securities claims is governed by federal law and by state law on the pendent state claims." *Quintel Corp. v. Citibank, N.A.,* 606 F.Supp. 898, 913 (S.D.N.Y.1985) (citing *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 692 n. 13 (2d Cir.1983); *Spector v. Mermelstein,* 485 F.2d 474, 481 (2d Cir. 1973)). In New York, CPLR § 5001 governs the award of prejudgment interest and provides in pertinent part:

> (a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

Under New York CPLR § 5001(a), prejudgment interest is recoverable as a matter of right in property damage cases brought at law. *See Quintel Corp.,* 606 F.Supp. at 913.

Plaintiff's argues, essentially, that prejudgment interest is warranted in the instant case because a breach of fiduciary duty claim falls within the class of claims as to which it is appropriate, under CPLR § 5001, to award prejudgment interest. Pl. Suppl.Mem. at 4–5. The proposition that prejudgment interest is customarily awarded to compensate a plaintiff for damages due to the loss of the use of money in cases involving breach of fiduciary duty does indeed find ample precedent. *See Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 637 F.2d 77, 87 (2d Cir.1980); ("award of prejudgment interest is in the first instance, compensatory, and is customary in cases involving a breach of fiduciary duties"); *Securities and Exchange Comm'n. v. Hasho,* 784 F.Supp. 1059, 1112 (S.D.N.Y. 1992) (same); *Dardaganis v. Grace Capital Inc.,* 684 F.Supp. 1196, 1199 (S.D.N.Y. 1988), *modified on other grounds,* 889 F.2d 1237 (2d Cir.1989) (same); *Quintel,* 606 F.Supp. at 914 (same); *see also, Mermelstein,* 485 F.2d at 481–82 and n. 8; *Norte & Co. v. Huffines,* 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970). This proposition, however, is not contested by defendants in the instant dispute. What is contested is whether prejudgment interest should be added where the damages awarded plaintiff already include an interest component designed to compensate plaintiff for the loss of the use of her money. Plaintiff fails to cite any authority that advances her position on this specific question.

Notably, not one of the cases cited by plaintiff supports an award of prejudgment interest under N.Y. CPLR § 5001 when interest has already been included in the amount of damages awarded by the jury. On the contrary, the very cases upon which plaintiff primarily relies all involve the granting of prejudgment interest only where such a grant constitutes a one-time interest award necessary to make plaintiff whole. *See e.g., Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 484–86 (2d Cir.1983) (defendant's breach of contract caused plaintiff to suffer out-of-pocket interest expense on loan to finance aborted transaction; prejudgment interest granted on interest payments made by plaintiff, but prejudgment interest expressly disallowed on that part of contract price recovery that would have been used to pay off loan because this would constitute double recovery); (*Blyth, Eastman Dillon & Co.,* 637 F.2d at 86–87 (plaintiff deprived of "use of principal sum" for nine years due to aiding and abetting by a reckless fiduciary; prejudgment interest granted on principal sum to provide full compensation "in view of the high inflation rates that beset this period"); *Mermelstein,* 485 F.2d at 481–83 (damage award comprised of principal amount of loans made by plaintiff on

improper advice of fiduciary; prejudgment interest on the loan amounts deemed necessary to make plaintiff whole); *Dardaganis*, 684 F.Supp. at 1197–1200 (damages comprised of amount lost in 1984 due to fund manager's improper investments constituting breach of fiduciary duty under ERISA; prejudgment interest granted to compensate for interest that would have been earned on the lost amount). Moreover, as defendants correctly point out, New York courts have already held that under CPLR § 5001, "the Court cannot add interest if there is a possibility that the jury have already allowed interest in the amount of recovery fixed in the verdict." *Wilcoxon v. Sun Oil Co.*, 49 Misc.2d 589, 267 N.Y.S.2d 956, 958 (N.Y.Sup.Ct.1966) (quoting *First Int'l Pictures, Inc. v. F.C. Pictures Corp.*, 262 A.D. 21, 27 N.Y.S.2d 816, 818 (1941); *see also*, N.Y. CPLR § 5001 (McKinney 1992), Legis.Stud. & Rpts., Subd. (c) (discussing problem of avoiding a double interest recovery in damages awarded).

Plaintiff's suggestion that this Court is bound to award her prejudgment interest under N.Y. CPLR § 5001 (Pl.Suppl.Mem. at 4) is also contrary to the Second Circuit's holding in *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 484–86 (2d Cir.1983). In *Bulk Oil*, the Court held that it was not bound to award prejudgment interest under CPLR § 5001, where such an award would "amount to a double recovery." 697 F.2d at 485. The Court explained:

> Referring to the statutory language, "[i]nterest shall be recovered," [plaintiff] argues that statutory interest is mandated by CPLR § 5001. We reject that argument. Our function is not to read the statute literally but to give effect to the legislative intent.

697 F.2d at 486 n. 12 (citations omitted). The Circuit Court in *Bulk Oil* disallowed an award of prejudgment interest under CPLR § 5001 where such an award constituted "a windfall," contrary to the legislative intent of the statute. *Id.* at 485–86.

The intent of awarding prejudgment interest under CPLR § 5001 is to compensate an aggrieved party for damages due to the loss of the use of money or its equivalent, or a loss of the opportunity to realize a fair return on that money. *Bulk Oil*, 697 F.2d at 484–85 (citing cases); *Hasho*, 784 F.Supp. at 1112. Under New York law, prejudgment interest is calculated at 9% per annum on a simple interest basis for all claims arising after June 25, 1981. N.Y. CPLR § 5004 (McKinney 1992); *see Hasho*, 784 F.Supp. at 1112; *Quintel*, 606 F.Supp. at 915. In the instant case, what plaintiff lost was the use of her principal sums of money during the period in which such sums were tied up in the limited partnership interests recommended by defendants. If the total damages awarded plaintiff were comprised only of those principal sums she initially invested due to defendants' advice (net of distributions and proceeds from such investments), awarding prejudgment interest on those sums would be appropriate to compensate plaintiff for the lost "opportunity to realize a fair return on that money." See *Hasho*, 784 F.Supp. at 1112. The Court specifically accounted for this lost opportunity to plaintiff, however, when it instructed the jury to add to the damage award the amount of interest which plaintiff would have earned on a risk-free investment of her principal. Indeed, the total interest awarded to plaintiff, in the amount of $524,354.85 after the Court's remittitur, is calculated at interest rates of 11.8% and 12.7%—rates higher than the statutory prejudgment interest rate of 9% under the N.Y. CPLR. By requesting, in addition, prejudgment interest on both the interest and lost principal portions of her damage award, plaintiff essentially seeks a double recovery of interest. We are aware of no authority that directs this Court to grant plaintiff such a windfall.

Plaintiff's counsel attempt to characterize plaintiff's primary loss as the loss of "a stream of income or periodic payments, *e.g.*, wages, installments, rents, interest, or an annuity," for which plaintiff is compensated by the interest portion of her damage award, such that granting prejudgment interest upon this damage award would be appropriate. Pl.Suppl.Mem. at 5–6. We find counsel's characterization unconvinc-

**548**

ing. Plaintiff's claim against defendants does not stem from being deprived of a guaranteed stream of payments to which plaintiff was entitled, either contractually or under some other colorable right, to justify an analogy to a claim for lost wages or other such periodic payments. Rather, plaintiff's claim stems from a breach of fiduciary duty in relation to the investment of plaintiff's principal sum, in the amount of $596,000, into limited partnership interests. In this instance, plaintiff's recovery should compensate for any lost principal, and for interest that would have been earned on that principal during the period the principal was improperly invested due to defendants' breach of duty. Just as in a case involving withheld wage payments, an appropriate damage award will compensate for the deprived wages and interest on those wages from the time each wage payment was due. Counsel's attempt to characterize plaintiff's loss, in this instance, as the loss of some guaranteed stream of income can find no basis on the facts of this case or, for that matter, on the facts of any case of which we are aware. Under the present circumstances, plaintiff's request for prejudgment interest is without merit and is therefore denied.

### III. *Defendants' Motion For A New Trial*

Defendants move for a new trial on grounds that "(i) the jury's verdict with respect to breach of fiduciary duty cannot be reconciled with its verdicts on the first three counts and/or (ii) the verdict form submitted to the jury improperly omitted the element of deceitful intent from the fiduciary duty claim." Def.Orig.Mem. at 1.

 Unlike the standards governing judgments notwithstanding the verdict, the discretion afforded the Court to grant a new trial is very broad. The Court is guided by the principle that it must try to ensure "that substantial justice is done on the facts of the individual case." *Werbungs Und Commerz Union Austalt v.*

*Collectors Guild. Ltd.*, 728 F.Supp 975, 979 (S.D.N.Y.1989) (quoting 6A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 59.05[5] at 59–47), *modified on other grounds*, 930 F.2d 1021 (2d Cir.1991). "The granting of a new trial is discretionary with the court and subject to no fixed rule except a consideration of what is just." *Id.*

 We remain entirely unconvinced that considerations of justice require this Court to grant defendants a new trial. Both theories defendants advance to obtain a new trial are buttressed on the assumption that deceptive intent is an essential element of a claim, under New York common law, for breach of fiduciary duty. *See* Def.Orig.Mem. at 6–10. Defendants fail to cite any authority whatsoever that justifies this assumption.[8] The weight of authority in New York clearly holds that proof of deceitful intent is not an element of a claim for breach of fiduciary duty. Rather, failure to exercise the level of skill and care expected of one in the position of a fiduciary, or an abuse of that position, with or without the intent to deceive, is sufficient to constitute breach of fiduciary duty:

> Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive is then the standard of behavior.

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (N.Y.1928). The principle articulated by Justice Cardozo in *Meinhard*—that a fiduciary may be held liable without proof of deceitful intent—has long remained the uniform law of New York. *See Pitcher v. Sutton*, 238 A.D. 291, 292–93, 264 N.Y.S. 488 (4th Dept.1933), *modified on other grounds*, 240 A.D. 754, 265 N.Y.S. 929, *aff'd* 264 N.Y. 638, 191 N.E.

8. In fact, as plaintiff points, defendants failed to make timely objection to the absence of an intent element from the Court's verdict form or the interrogatory as read, and defendants' own proposed verdict from made no mention of any intent requirement on the fiduciary duty claim. Pl. Orig. Mem. at 5–6.

603; *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 466–67, 541 N.Y.S.2d 746, 748, 539 N.E.2d 574, 576 (1989); *Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.,* 45 N.Y.2d 692, 698–700, 412 N.Y.S.2d 593, 596–97, 385 N.E.2d 285, 287–88 (1978); *Brown v. Lockwood,* 76 A.D.2d 721, 730–31, 432 N.Y.S.2d 186, 193–94 (2d Dept. 1980); *Laurenzano v. Laurenzano,* 156 A.D.2d 430, 430–31, 548 N.Y.S.2d 547, 549 (2d Dept.1989). Consequently, we find no reason to grant defendants' motion for a new trial.

## CONCLUSION

Defendants' motion for remittitur is granted. The Court orders remittitur of the portion of plaintiff's interest award of $817,391 in excess of $524,354.85. Plaintiff's net compensatory damage award will be $579,677.85. If plaintiff does not accept such remittitur within ten days, a new trial will be ordered on the issue of damages. Plaintiff's request for prejudgment interest on the damage award is denied.

SO ORDERED

## APPENDIX

## EXHIBIT A

| SUMMARY OF INCOME DAMAGES BY INVESTMENT | | | | | |
|---|---|---|---|---|---|
| Investment | Amount ($) | Dates Held[1] | Term (yrs) | Int. rate[2] (%) | Total Income ($) |
| NTS IV | 83,000 | 8/30/83 — present | 9.25 | 11.8 | $ 90,594.50 |
| Phoenix | 85,000 | 8/30/83 — present | 9.25 | 11.8 | 92,777.50 |
| Publ.Stor. | 40,500 | 8/30/83 — present | 9.25 | 11.8 | 44,205.75 |
| NC/KC | 60,000 | 8/30/83 — present | 9.25 | 11.8 | 65,490.00 |
| NTS V | 75,000 | 8/30/84 — 1/21/92 | 7.38 | 12.7 | 70,294.50 |
| IEA | 10,000 | 8/30/84 — present | 8.25 | 12.7 | 10,477.50 |
| Angeles | 50,000 | 8/30/84 — 7/31/89 | 4.91 | 12.7 | 31,178.50 |
| AIM | 25,000 | 8/30/84 — 6/23/89 | 4.80 | 12.7 | 15,240.00 |
| Damson | 75,000 | 8/30/84 — 8/23/89 | 4.98 | 12.7 | 47,434.50 |
| Carlyle | 30,000 | 8/30/84 — 10/11/89 | 5.11 | 12.7 | 19,469.10 |
| PLM | 50,000 | 8/30/84 — 6/16/89 | 4.78 | 12.7 | 30,353.00 |
| Wildwood | 12,500 | 10/31/86 — present | 6.08 | 9.0 | 6,840.00 |
| TOTAL DAMAGES TO INCOME[3] | | | | | $524,354.85 |

1. Dates of holdings and sale are from Plaintiff's Exhibit 131 (attached), which was received into evidence without objection. Where investments are still held, the cutoff date is 11/30/92.

2. The interest rates of 11.8% and 12.7% are based upon those in fact available from 20– and thirty year Treasury Bonds on the dates indicated, as Louis Ehrenkrantz testified (Tr. 726–27, and generally Tr. 718–35). The 9% rate for 1986 is conservative based upon: (1) the rate for 5–year Treasuries as reflected in the record (Tr. 818, 834), (2) the New York statutory rate of interest, and (3) a judicially-noticed rate of return of 10% (*see* Pltff's Orig.Mem. at 18). Higher rates are supported by the record, but are not used in this computation (*e.g.,* Tr. 726, 732, 736, 817). Lower rates are not justifiable as: (1) having been rejected by the jury, and (2) not being necessary to a risk-free investment even assuming sale of Bonds after 5 years, since such sale would in fact have produced a *gain.*

3. THESE FIGURES DO NOT INCLUDE *ANY* ADJUSTMENT FOR INFLATION OR REINVESTMENT OF INTEREST INCOME.